UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
XIAO LING CHEN *et al.*,

                Plaintiffs,

        -against-

XPRESSPA AT TERMINAL 4 JFK LLC,
*et al.*,

                Defendants.
----------------------------------------------------------X

**MEMORANDUM
AND ORDER**
15 CV 1347 (CLP)

**POLLAK**, United States Magistrate Judge:

On March 16, 2015, plaintiffs commenced this class and collective action on behalf of themselves and other similarly situated employees against XpresSpa at Terminal 4, JFK, LLC, and 34 other XpresSpas located in various airport terminals around the country.  Plaintiffs seek damages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206(a), 207(a), and 216(b), and the New York Labor Law ("NYLL") § 190 et seq. and § 650 et seq., for unpaid minimum wages, unpaid overtime compensation, unpaid spread of hours wages, and for violations of the requirements to provide wage notices and accurate wage statements under Sections 195(1) and 195(3) of the NYLL.  Defendants Binn and Partners, LLC, Spa Products Import & Distribution Co., LLC, Marisol Binn, and Moreton Binn were also named as defendants in the Complaint (collectively, with XpresSpa, "defendants").  (See generally Compl.[1])

On September 15, 2017, the parties indicated that they had reached a proposed settlement and filed a motion with this Court requesting an Order[2] granting preliminary approval of the proposed settlement as set forth in the original Settlement Agreement and Release (the "original

---

    [1] Citations to "Compl." refer to plaintiffs' Complaint, filed on March 16, 2015, ECF No. 1.
    [2] On March 3, 2017, the parties consented to the undersigned for all purposes.
U:\xpresspa settlement july2019 v7.docx

Settlement Agreement"). (See Sett. Agr.).[3] The Court denied the request and raised a number of concerns regarding the original Settlement Agreement, including the procedures for determining each Class and Collective Member's awards, the mechanism for providing notice, the fairness of the proposed service awards, and the proposed *cy pres* recipient. (See generally 3/30/18 Order).[4] The Court held a hearing on April 25, 2018, after which the parties submitted a revised Settlement Agreement and Notice ("Revised Settlement Agreement").[5] For the reasons set forth below, the Court still lacks sufficient information to determine that the Revised Settlement Agreement as proposed is fair and reasonable and that the procedure for providing notice to the Collective Members is compliant with the requirements of the FLSA and with due process. Accordingly, the Court declines to approve the parties' proposed revised settlement at this time.

## FACTUAL BACKGROUND

The relevant facts underlying this class and collective action are set forth more fully in the Court's earlier Report and Recommendation, dated February 16, 2016 ("R&R"),[6] and in the Memorandum and Order, dated March 30, 2018. (See 3/30/18 Order). As set forth therein, plaintiffs and other similarly situated employees were employed by defendants as spa technicians, performing massages, manicures, and other spa treatments for travelers in the 19 airports across the country where the XpresSpas were located. (Compl. ¶ 1). Plaintiffs allege

---

[3] Citations to "Sett. Agr." refer to the original Settlement Agreement, filed on September 15, 2017 as Exhibit A to the Affidavit in Support of Motion for Preliminary Approval of Class Settlement, ECF No. 85-1.
[4] Citations to "3/30/18 Order" refer to the Order of this Court, dated March 30, 2018, ECF No. 86.
[5] Citations to "Revised Settlement Agreement" refer to the revised Settlement Agreement, filed as Exhibit A to the letter of C.K. Lee, dated May 18, 2018, ECF No. 91-1.
[6] Citations to "R&R" refer to this Court's Report and Recommendation, dated February 16, 2016, ECF No. 62, which was adopted by the district court on September 23, 2016.

2

that they were paid on commission, that they were required to travel to and from spas located in various terminals for which they received no travel time compensation, and that they were also required to perform other work for which they received no compensation. (Id. ¶¶ 58, 60(1), 62(6), 62(7); R&R at 3-4). Plaintiffs claim that they were misclassified as independent contractors so that they would not be entitled to overtime compensation for hours worked over 40 in a week, and that they regularly worked eight hours per day for four to six days a week, during which time they received no base pay and were not paid minimum wages. (Compl. ¶¶ 58, 61; R&R at 3). Finally, they assert that they were never paid spread of hour wages nor did they receive the requisite wage notices or wage statements required by the NYLL. (Compl. ¶¶ 65-66; R&R at 4).

On February 16, 2016, this Court issued a Report and Recommendation, recommending that the plaintiffs' motion for conditional certification of the FLSA claims be approved, and that the parties send the proposed Notice and Consent Form to the covered employees to allow them to opt in to the collective action. The Court's Report was affirmed by the district court on September 23, 2016. However, the Notice was not sent at that time.

Instead, on September 15, 2017, the parties indicated that they had engaged in settlement negotiations and had reached a settlement in principle with the assistance of Martin Scheinman, an experienced mediator with this Court. They then filed a motion seeking preliminary approval of the class action settlement, conditional certification of the Settlement Class, appointment of class counsel, and approval of the proposed Notice of settlement. (See Lee Decl.).[7]

---

[7] Citations to "Lee Decl." refer to the Declaration of C.K. Lee, dated September 15, 2017, ECF No. 85.

A.      The Original Settlement Agreement

As an initial matter, this is a hybrid Rule 23 class action and collective action brought

pursuant to the FLSA.  Under the original Settlement Agreement, the parties had agreed to a

settlement fund of $480,000, to cover damages to the 296 Rule 23 Class Members, who worked

at XpresSpas in New York (the "New York Rule 23 Class"), and were owed damages under the

NYLL, as well as damages owed to the 1,562 Collective Members (the "Outside New York

Collective Members"), who were owed wages under the FLSA.  (Pls.' Mem.[8] at 5).  Before

distribution of the settlement fund to the two subclasses, the original Settlement Agreement

provided for the payment of attorneys' fees and costs, service awards, and fees to administer the

settlement fund.  (Id.)  Under the original Settlement Agreement, the $480,000 was to be divided

as follows:  1) one-third of the fund, or approximately $160,000, was to be paid to Class

Counsel; 2) $50,000 would be paid to Advanced Litigation Strategies[9] to administer the fund; 3)

the four named plaintiffs would each receive $10,000 for a total of $40,000; and 4) the eight opt-

ins would receive $2,000 each for a total of $16,000.  (Id. at 5-7; 3/30/18 Order at 6).  The

remainder of the fund, not including an additional amount to be subtracted for costs, which are

estimated to be close to $3,987.50, was to be divided among the 296 New York Class Members

and the 1,267[10] Collective Members as follows:  1) one-third of the remaining $214,000, or

---

[8] Citations to "Pls.' Mem." refer to the Memorandum of Law in Support of Plaintiffs'
Motion for Preliminary Approval of Class Action Settlement, Conditional Certification of the
Settlement Class, Appointment of Plaintiffs' Counsel as Class Counsel, and Approval of
Proposed Notice of Settlement, filed on September 15, 2017, ECF No. 83.
[9] As noted in the Court's earlier Order, Advanced Litigation Strategies is "under common
control of Plaintiffs' Counsel," and there has been no information provided as to how its $50,000
projected fee was calculated.  (See 3/30/18 Order at 6).
[10] In actuality, there are 1,562 employees with FLSA claims, but since 296 are recovering
damages as members of the New York Class, they have been subtracted for purposes of dividing
the remainder to the nationwide members of the Collective.

4

$71,333.33, was to be divided among the 296 New York Class Members based on the number of weeks worked; 2) two-thirds of the $214,000, or $142,666.67, would then be divided among the 1,267 Collective Members, also calculated on the number of weeks worked.

The original Settlement Agreement provided for the mailing of notices to the New York Class Members prior to the fairness hearing, advising them of the details of the settlement and the steps to take if they wished to opt out of the settlement. (Sett Agr. ¶¶ 3.4(B), 3.5). As for the 1,267 Outside New York Collective Members, instead of mailing them a notice advising them of their right to opt in to the collective action, the parties would mail them a check for the amount the parties determined they were owed, based on the number of weeks worked. (3/30/18 Order at 11-12). If the recipient of the check cashed the check, the Settlement Agreement provided that this would be the equivalent of opting in and by cashing the check, the recipient would be deemed to have released all their claims against the defendants. (Id.)

After reviewing the original Settlement Agreement and the parties' papers in support of the motion for preliminary approval, this Court issued a Memorandum and Order, dated March 30, 2018, raising a number of concerns regarding the proposed settlement, and specifically noting that the parties had failed to provide sufficient information to allow the Court to determine if the settlement was fair and adequately compensated the Class and Collective Members for their claims. The Court therefore denied the parties' joint motion without prejudice to renew.

B.      The April Hearing

Following the issuance of the March 30, 2018 Memorandum and Order, the Court held a hearing on April 25, 2018, to allow the parties to respond to some of the Court's concerns. The parties first addressed the issue of the collective action notice. With respect to the Court's

5

questioning as to whether the Court has jurisdiction under Cheeks v. Freeport Pancake House, Inc., 796 F.3d 199 (2d Cir. 2015), cert. denied, 136 S. Ct. 824 (2016), to decide the fairness of any collective action settlement for putative Collective Members who had not yet appeared in the action, counsel for plaintiffs explained that, in his view, the mechanism proposed here would be more favorable for the claimants, as they would not have to submit a claim form in order to get paid. (Tr.[11] at 3). Instead, by sending the checks in the first instance, counsel suggested that more people would actually receive money. (Id. at 3-4). Counsel further argued that "[t]here have [been] many, many cases here in the Eastern and in the Southern Districts[,] cases in the Second Circuit, where courts have pre-approved payments to people who have not yet opted in by knowing their allocations first and knowing what the amounts of the allocations are and whether if a person were to opt in with the allocation, whether that would be fair." (Id. at 10). Counsel indicated that he would supply the Court with the caselaw approving similar settlements. (Id. at 6).

When asked what the Collective Members would be opting into, because the language in the proposed notice suggested that by the time the Collective Members received their checks that the case had already been dismissed by the Court, counsel explained that they were opting into the "settlement that the Court has found to be fair." (Id. at 11). Counsel represented that they would submit a spreadsheet demonstrating the amounts that each person would receive under the Settlement. (Id. at 12, 13).

Counsel also agreed to supplement the papers to account for the service awards and to address the Court's concern regarding the suggested *cy pres* award. (Id. at 21, 22).

---

[11] Citations to "Tr." refer to the transcript of proceedings before this Court on April 25, 2018, ECF No. 89.

C.    The Revised Settlement Agreement

Following the hearing, counsel for plaintiffs filed a letter dated May 18, 2018 and

attached a revised Settlement Agreement ("Revised Settlement Agreement").  (See Pls.' Ltr,[12]

Ex. A).

The letter from counsel and the Revised Settlement Agreement address some, but not all

of the Court's concerns.  The Revised Settlement Agreement provides for a reduced settlement

fund in the amount of $432,000, exclusive of Employer Payroll Taxes.  This represents a

reduction from the original settlement amount which was $480,000.  Plaintiffs explained that the

original Settlement Agreement included an allocation of $40,000 to the four named plaintiffs as

compensation for their claims of discrimination; those claims have now been addressed in a

separate agreement.  (See Pls.' Ltr., Ex. A ¶ 2.23).  Although the letter and Revised Settlement

Agreement address the Court's concerns as to the service awards and the cy pres award, the

Revised Settlement Agreement maintains the same procedures for distribution of notices and

determination of individual awards.

Given that the Court continues to lack the information necessary to evaluate the fairness

of the amounts being awarded as part of the collective action settlement as required by Cheeks v.

Freeport Pancake House, Inc., 796 F.3d 199 (2d Cir. 2015), and because there are additional

concerns raised by the procedures for distribution of the settlement, the Court declines to

approve the settlement for the reasons set forth below.

---

[12] Citations to "Pls.' Ltr" refer to plaintiffs' letter, dated May 18, 2018, ECF No. 91.

DISCUSSION

A.     Standards for Approval of Rule 23 Class Settlements

To grant preliminary approval of a class settlement under Rule 23(e) of the Federal Rules

of Civil Procedure, the Court must determine that the proposed settlement is "fair, adequate, and

reasonable, and not a product of collusion." Joel A. v. Giuliani, 218 F.3d 132, 138 (2d Cir.

2000) (citations omitted); see Fed. R. Civ. P. 23(e).  Whether a settlement is fair is a

determination within the sound discretion of the court.  Levitt v. Rodgers, 257 Fed. App'x 450,

453 (2d Cir. 2007) (citing In re Ivan F. Boesky Sec. Litig., 948 F.2d 1358, 1368 (2d Cir. 1991)).

Generally, approval of a class action settlement involves a two-step process:  first, the

court preliminarily approves the proposed settlement by evaluating the written submissions and

informal presentation of the settling parties and the negotiating process leading to the settlement.

Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir. 2005); see Hernandez v.

Merrill Lynch & Co., No. 11 CV 8471, 2012 WL 5862749, at *1 (S.D.N.Y. Nov. 15, 2012)

(holding that the court need only find that there is "probable cause" to submit the settlement to

the Class Members) (quoting In re Traffic Exec. Ass'n E. R.Rs., 627 F.2d 631, 634 (2d Cir.

1980)).

Once notice has been sent to the class, the court holds a fairness hearing to "determine

whether the settlement's terms are fair, adequate, and reasonable . . . ." Capsolas v. Pasta Res.,

Inc., No. 10 CV 5595, 2012 WL 4760910, at *4 (E.D.N.Y. Oct. 5, 2012).  In evaluating a

proposed settlement for procedural fairness, the court has a "'fiduciary responsibility of ensuring

that the settlement is . . . not a product of collusion, and that the class members' interests [were]

represented adequately.'" Clement v. Am. Honda Fin. Corp., 176 F.R.D. 15, 29 (D. Conn. 1997)

(internal citation omitted) (quoting In re Warner Commc'ns Secs. Litig., 798 F.2d 35, 37 (2d Cir.

8

1986)); see also Becher v. Long Island Lighting Co., 64 F. Supp. 2d 174, 178 (E.D.N.Y. 1999)

(holding that the court must determine if the settlement was "achieved through arms-length

negotiations by counsel with the experience and ability to effectively represent the class's

interests") (citing Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982)); see also D'Amato v.

Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001) (noting that the district court must "determine[] a

settlement's fairness by examining the negotiating process leading up to the settlement as well as

the settlement's substantive terms"); In re Nissan Radiator/Transmission Cooler Litig., No. 10

CV 7493, 2013 WL 4080946, at *4 (S.D.N.Y. May 30, 2013).

The Court must also ensure that the settlement achieves substantive fairness, and the

Second Circuit has enumerated nine factors to consider:

> (1)[T]he complexity, expense and likely duration of the litigation; (2) the
> reaction of the class to the settlement; (3) the stage of the proceedings and
> the amount of discovery completed; (4) the risks of establishing liability;
> (5) the risks of establishing damages; (6) the risks of maintaining the class
> action through the trial; (7) the ability of the defendants to withstand a
> greater judgment; (8) the range of reasonableness of the settlement fund in
> light of the best possible recovery; and (9) the range of reasonableness of
> the settlement fund to a possible recovery in light of all the attendant risks
> of litigation[.]

City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974) (internal citations omitted),

abrogated on other grounds, Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000);

see also D'Amato v. Deutsche Bank, 236 F.3d at 86; Garcia v. Pancho Villa's of Huntington

Village, No. 09 CV 486, 2012 WL 5305694, at *4 (E.D.N.Y. Oct. 4, 2012).

9

B.     Standards for Certifying a Rule 23 Class

Before examining the settlement, the Court must also consider whether to certify the

Class for settlement purposes.  Rule 23(a) of the Federal Rules of Civil Procedure governs

class certification, providing:

> One or more members of a class may sue or be sued as
> representative parties on behalf of all members only if: (1) the class
> is so numerous that joinder of all members is impracticable; (2)
> there are questions of law or fact common to the class; (3) the claims
> or defenses of the representative parties are typical of the claims or
> defenses of the class; and (4) the representative parties will fairly
> and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

In addition to satisfying these prerequisites, plaintiffs also must satisfy one of the three

subdivisions of Rule 23(b):  (1) that separate actions pose a risk of inconsistent adjudications or

would substantially impair the ability of other individuals to protect their interests; (2) injunctive

or declaratory relief is sought concerning the class as a whole; or (3) common questions of law

or fact predominate over individual questions, and a class action is superior to other methods for

bringing suit.  Fed. R. Civ. P. 23(b).  See generally Amchem Prods., Inc. v. Windsor, 521 U.S.

591 (1997); Annunziato v. Collecto, Inc., 293 F.R.D. 329, 334 (E.D.N.Y. 2013).  It is plaintiffs'

burden to establish compliance with each of the requirements of Rule 23 by a preponderance of

the evidence, see In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d 108, 117 (2d Cir. 2013), but

in analyzing the issue of certification, the court accepts as true the allegations in the complaint

regarding the merits of the claim.  See D'Alauro v. GC Servs. Ltd. P'ship, 168 F.R.D. 451, 454

(E.D.N.Y. 1996) (citation omitted). While courts are required to conduct a "rigorous" analysis,

Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 465-66 (2013), the court may

exercise "broad discretion" and "take a liberal rather than a restrictive approach" when reviewing whether to certify a class.  Annunziato v. Collecto, Inc., 293 F.R.D. at 334.  Pursuant to Rule 23(c)(1) of the Federal Rules of Civil Procedure, "the court can make a conditional determination of whether an action should be maintained as a class action, subject to final approval at a later date."  Collier v. Montgomery Cty Hous. Auth., 192 F.R.D. 176, 181 (E.D. Pa. 2000).

For purposes of settlement only, defendants here do not oppose conditional certification of the Rule 23 Class.  (See Pls.' Mem. at 18); see also 4 Alba Conte, et al., Newberg on Class Actions § 11.27 (4th ed. 2002) (providing "[w]hen the court has not yet entered a formal order determining that the action may be maintained as a class action, the parties may stipulate that it be maintained as a class action for the purpose of settlement only").

1.  The Requirements of Rule 23(a)

(a)  Numerosity

Turning to the Rule 23(a) factors, the court may certify a class only if the class is so numerous that joinder becomes impractical.  Fed. R. Civ. P. 23(a)(1).  The standard for presuming numerosity is 40 or more members.  Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995).

In this case, there are 296 potential New York Rule 23 Class Members, which is more than sufficient for numerosity.  (Pls.' Mem. at 19).  Thus, the allegations in the Complaint clearly satisfy the standard of numerosity.

(b)  Commonality

In determining whether plaintiffs can show that the claims of the potential Rule 23 Class Members share common questions of law or fact, the Rule does not require that "'all questions of

11

law or fact raised be common.'" <u>Savino v. Computer Credit, Inc.</u>, 173 F.R.D. 346, 352

(E.D.N.Y. 1997) (emphasis in original) (quoting <u>Halford v. Goodyear Tire & Rubber Co.</u>, 161

F.R.D. 13, 18 (W.D.N.Y. 1995)).  As long as "common questions . . . predominate," any

differences in the circumstances raised by individual members will not defeat the requirement of

commonality.  <u>In re Sadia, S.A. Sec. Litig.</u>, 269 F.R.D. 298, 304 (S.D.N.Y. 2010).  In other

words, "there need only be a single issue common to all members of the class," as the "critical

inquiry is whether the common questions lay at the 'core' of the cause of action alleged."  <u>Savino</u>

<u>v. Computer Credit, Inc.</u>, 173 F.R.D. at 352.

      Here, there are several common legal and factual issues.  More specifically, the New

York Rule 23 Class plaintiffs worked at various XpresSpas at airports in New York, and all were

arguably subject to the same wage practices and policies, including the same commission

payment practice.  (Pls.' Mem. at 20).  Among other common issues are whether defendants

improperly failed to pay minimum wages, failed to pay proper overtime, and failed to provide

proper wage statements and wage notices as required by the NYLL.  (<u>Id.</u>)  These types of

practices have been found to be sufficient to meet the commonality requirement of Rule 23.  <u>See</u>

<u>Campos v. Goode</u>, No. 10 CV 224, 2010 WL 5508100, at *1-2 (S.D.N.Y. Nov. 29, 2010);

<u>deMunecas v. Bold Food LLC</u>, No. 09 CV 0440, 2010 WL 2399345, at *1 (S.D.N.Y. Apr. 19,

2010).

      As such, the Court finds that there are common legal and factual issues sufficient to

satisfy the requirements of Rule 23(a)(2).

      (c)  <u>Typicality</u>

      Rule 23(a)(3) requires that the lead plaintiffs' claims be typical of the claims of the class.

Typicality has been found "when each class member's claim arises from the same course of

events and each class member makes similar legal arguments to prove the defendant's liability." Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993). Typicality is "usually met irrespective of varying fact patterns which underlie individual claims" so long as the claims of the class representative are typical of the Class Members' claims. Bourlas v. Davis Law Assocs., 237 F.R.D. 345, 351 (E.D.N.Y. 2006) (quoting D'Alauro v. GC Servs. Ltd. P'ship, 168 F.R.D. at 456-57).

Here, the claims of the Named Plaintiffs satisfy the requirements of the Rule in that they, like other members of the proposed Class, allege claims based on the same legal and factual circumstances that form the bases of the Class Members' claims. Specifically, plaintiffs allege that defendants: (1) used the same wage practices and policies with all putative Class Members; (2) failed to pay proper minimum and overtime wages, among other things; and 3) failed to provide proper wage notices and wage statements under the NYLL. (Pls.' Mem. at 21). Plaintiffs' claims are therefore sufficiently typical to warrant certification.

(d) Adequacy of Representation

In order to satisfy Rule 23(a)(4), which requires the interests of the class to be adequately represented, the Second Circuit has established a two-prong test. In re Drexel Burnham Lambert Grp., 960 F.2d 285, 291 (2d Cir. 1992). First, there must be a showing that class counsel is "'qualified, experienced and generally able' to conduct the litigation." Halford v. Goodyear Tire & Rubber Co., 161 F.R.D. at 19 (quoting Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 562 (2d Cir. 1968), vacated on other grounds, 417 U.S. 156 (1974)). Second, the Class Members' interests may not be "antagonistic" to one another. County of Suffolk v. Long Island Lighting Co., 710 F. Supp. 1407, 1413 (E.D.N.Y. 1989), aff'd, 907 F.2d 1295 (2d Cir. 1990).

13

Pursuant to Fed. R. Civ. P. 23(g), the Court must assess the adequacy of proposed class counsel, looking to the work counsel has done in identifying and investigating the potential claims, counsel's experience in handling class actions and claims of the type at issue in the case, and counsel's knowledge of the applicable law.  See Fogarazzo v. Lehman Bros., Inc. 232 F.R.D. 176, 182 (S.D.N.Y. 2005); see also In re Fuwei Films Sec. Litig., 247 F.R.D. 432, 436 (S.D.N.Y. 2008) (stating: "'(1) there should be no conflict between the interests of the class and the named plaintiff nor should there be collusion among the litigants; and (2) the parties' attorney must be qualified, experienced, and generally able to conduct the proposed litigation'") (quoting Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co., 229 F.R.D. 395, 412-13 (S.D.N.Y. 2004)); Babcock v. Computer Assocs. Int'l, Inc., 212 F.R.D. 126, 131 (E.D.N.Y. 2003) (quoting In re Drexel Burnham Lambert Grp., Inc., 960 F.2d at 291).  The Court should also consider the resources that counsel is able to commit in representing the Class.

Here, the proposed Class has been represented by the Lee Litigation Group, PLLC.  (Lee Decl. ¶¶ 7, 8).  Plaintiffs' counsel C.K. Lee represents that the lawyers in his firm have had "substantial experience" in prosecuting and settling wage and hour class actions and that the firm has previously been found to be adequate and appointed as class counsel in similar class actions. (Pls.' Mem. at 23-24).  He cites nine cases in which he has been appointed as class counsel since 2012.  (Id. at 25).

In light of the Court's concerns with the proposed settlement as set forth infra, the Court does not reach the issue of whether counsel should be approved as class counsel in this case. The Court gave counsel several opportunities to clarify certain aspects of the proposed settlement, but counsel has thus far failed to adequately do so.  Accordingly, at this time, the

14

Court is not in a position to find that the firm is "well-qualified to serve as lead counsel in this matter." In re Fuwei Films Sec. Litig., 247 F.R.D. at 439.

As for the second part of the analysis, there do not appear to be any conflicts between the Named Plaintiffs and the other members of the New York Rule 23 Class. They do not have any interests that are antagonistic to or at odds with those of the class members, and their interests appear to be aligned with those of the other Class Members.[13] (Pls.' Mem. at 21).

In order for a potential or actual conflict to defeat certification, it "must be fundamental." In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009) (internal quotation marks and citations omitted). There is no evidence that the interests of the Named Plaintiffs are fundamentally antagonistic to those of the Class Members, and the Court is unaware of any potential, fundamental conflict of interest between plaintiffs and the Class Members. Based on the nature of plaintiffs' claims, the Court finds that the Named Plaintiffs' claims are so interrelated with those of the other potential New York Rule 23 Class Members that they will be adequate class representatives.

---

[13] The Court does note that under the original Settlement Agreement, the Named Plaintiffs were to receive service awards of $10,000.00 each. Under the Revised Settlement Agreement, the service awards have been reduced and the Named Plaintiffs have entered into separate agreements with defendants regarding their national origin discrimination claims, for which they are now each receiving $10,000. (See Tr. at 21).

2.   The Requirements of Rule 23(b)(3)

(a)   Common Questions Predominate Over Individual Issues

Plaintiffs must also establish that the proposed class meets the requirements of Fed. R. Civ. P. 23(b)(3).  Under Rule 23(b)(3), a proposed class must be sufficiently cohesive and common issues must predominate in order to warrant adjudication as a class.  Amchem Prods, Inc. v. Windsor, 521 U.S. at 623.  Courts focus on whether there are common questions related to liability.  See Smilow v. Southwest Bell Mobile Sys. Inc., 323 F.3d 32, 40 (1st Cir. 2003); Iglesias-Mendoza v. La Belle Farm, Inc., 239 F.R.D. 363, 372-73 (S.D.N.Y. 2007).  Even if there are defenses that affect Class Members differently, that alone "does not compel a finding that individual issues predominate over common ones."  In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 138 (2d Cir. 2001) (quoting Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000)), overruled on other grounds, In re IPO Secs. Litig., 471 F.3d 24 (2d Cir. 2006).

In this case, plaintiffs allege that there are common issues as to whether the New York Rule 23 Class Members were subjected to the same unlawful pay practices that included not paying minimum wages or overtime.  (Pls.' Mem. at 23).  While there may be individualized issues of damages, plaintiffs argue that the common issues predominate.  (Id. at 23).  Since the New York Rule 23 Class Members' core factual allegations and legal theories predominate over any factual or legal variations among Class Members, the Court finds that common questions predominate in this case and plaintiffs have therefore satisfied Rule 23(b)(3).  See Torres v. Gristede's Corp., No. 04 CV 3316, 2006 WL 2819730, at *16 (S.D.N.Y. Apr. 9, 2010).

16

(b)  Class Action as Superior Method of Resolution

Additionally, to satisfy Rule 23(b)(3), plaintiffs must demonstrate that "a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Brown v. Kelly, 609 F.3d 467, 483 (2d Cir. 2010) (citation and internal quotation marks omitted).  The Rule requires the Court to consider:

> [(1)] the class members' interests in individually controlling the prosecution or defense of separate actions; [(2)] the extent and nature of any litigation concerning the controversy already begun by or against class members; [(3)] the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and [(4)] the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Here, plaintiffs claim that because the New York Rule 23 Class Members have limited financial resources, the expense and burden of individual litigation would make it impossible for all of them to individually redress the alleged harm done to them. (Pls.' Mem. at 23).  See Morris v. Affinity Health Plan, Inc., 859 F. Supp. 2d 611, 617 (S.D.N.Y. 2012).  In addition, proceeding as a class will preserve judicial resources by consolidating common issues of fact and law, and avoid repetitive proceedings and inconsistent adjudications.  See Aponte v. Comprehensive Health Mgmt, No. 10 CV 4825, 2011 U.S. Dist. LEXIS 60882, at *34 (S.D.N.Y. June 2, 2011).  Thus, the Court accepts that a class action is the superior method of resolution in this case.

Having determined that the parties have satisfied the prerequisites for certifying a class under Rule 23, the Court must, as noted, also make a finding as to whether the proposed

settlement is "fair, adequate, and reasonable, and not a product of collusion." Joel A. v. Giuliani, 218 F.3d at 138 (citations omitted); see Fed. R. Civ. P. 23(e).


A.      Collective Action Settlements

Before considering the fairness of the settlement to the Rule 23 Class, as noted in this Court's earlier Order, the proposed settlement here also encompasses the FLSA claims of 1,267 plaintiffs who have not opted into the action yet and who are outside of New York State. In the Second Circuit, before a settlement and stipulation of dismissal relating to a plaintiff's FLSA claims may take effect, the parties must obtain approval of the settlement from the district court. See Cheeks v. Freeport Pancake House, Inc., 796 F.3d at 206. This requirement applies to both members of a class of individuals pursuing claims under the FLSA and individuals who are proceeding on their own. The requirement "is consistent with what both the Supreme Court and [the Second Circuit] have long recognized as the FLSA's underlying purpose: 'to extend the frontiers of social progress by insuring to all our able-bodied working men and women a fair day's pay for a fair day's work.'" Id. (quoting A.H. Phillips, Inc. v. Walling, 324 U.S. 490, 493 (1945)).

In considering whether to approve an FLSA settlement, courts consider whether the agreement "reflects a reasonable compromise of disputed issues [rather] than a mere waiver of statutory rights brought about by an employer's overreaching." Le v. Sita Info. Networking Computing USA, Inc., No. 07 CV 86, 2008 U.S. Dist. LEXIS 46174, at *1-2 (E.D.N.Y. June 12, 2008); accord Lynn's Food Stores, Inc. v. United States, 679 F.2d 1350, 1354 (11th Cir. 1982) (holding that where an FLSA settlement is a reasonable compromise, the settlement should be

18

approved to "promote the policy of encouraging settlement of litigation").

In <u>Wolinsky v. Scholastic Inc.</u>, 900 F. Supp. 2d 332, 335 (S.D.N.Y. 2012), the court set forth factors that courts should consider in evaluating the fairness of a settlement in a collective action. The court made it clear that the proposed settlement should be evaluated in light of the "totality of the circumstances," including the following factors:

> (1) the plaintiff's range of possible recovery; (2) the extent to which the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses; (3) the seriousness of the litigation risks faced by the parties; (4) whether the settlement agreement is the product of arm's-length bargaining between experienced counsel; and (5) the possibility of fraud or collusion.

As with a Rule 23 class action, the Court must make a preliminary determination as to whether there is a sufficient basis to grant conditional certification of an FLSA collective. Here, the Court made the requisite findings and granted certification in February 2016. Thus, the only issue with respect to both the Rule 23 Class and the Collective Members under a <u>Cheeks</u> analysis is whether the revised settlement agreement is fair and reasonable.

B. <u>Concerns Raised by the Proposed Settlement</u>

As discussed <u>supra</u>, in conducting the <u>Cheeks</u> fairness review, the Court raised several concerns about the fairness of the original proposed settlement, particularly as it impacted the Outside New York Collective Members. The fairness determination is "'an information intensive undertaking, and the Parties must provide the Court with enough information to evaluate the bona fides of the dispute.'" <u>Douglas v. Allied Universal Security Servs.</u>, 371 F. Supp. 3d 78, 82 (E.D.N.Y. 2019) (quoting <u>Aguirre v. Torino Pizza, Inc.</u>, No. 18 CV 2004, 2019 WL 126059, at *2 (S.D.N.Y. Jan. 8, 2019)). As set forth below, the parties in this case have

failed to provide the Court with sufficient information to evaluate the fairness of the proposed

settlement to the Collective Members and have failed to demonstrate that the procedure to be

followed in providing notice to the Collective Members comports with the requirements of

Cheeks.

    1.   The Mechanism for Distribution of the Fund and Proposed Notice

       The first concern raised by this Court in its March 30, 2018 Order related to the fairness

of the proposed mechanism for notifying the Class and potential Collective Members and the

methods for distribution of the settlement fund and the release of claims.  The proposed hybrid

settlement purported to resolve the FLSA claims of the 1,562 Collective Class Members, of

which 1,267 are designated as "Outside New York Collective Members," and the approximately

296 New York Rule 23 Class Members who have both FLSA and NYLL claims.[14]  (See Pls.'

Mem. at 5).  Since the New York Rule 23 Class will be receiving a traditional notice, the Court's

concerns as to notice relate primarily to the Outside New York Collective Members.

       In the original Settlement Agreement, traditional notice was to be provided to the New

York Rule 23 Class Members, advising them of the lawsuit, the terms of the proposed settlement,

the date of the fairness hearing, and the opportunity to "opt out" of the settlement. As plaintiffs

explained in connection with the original settlement, the parties were proposing a procedure

whereby this Court would opine on the fairness of the settlement with respect to the members of

---

[14] As noted in this Court's prior Order filed on March 30, 2018, while Plaintiffs' Memorandum of Law represents that there were 1,562 "Collective Class Members," consisting of the 296 New York Rule 23 Class members and the 1,267 "Outside New York Collective Members" (see Pls.' Mem. at 5), the numbers actually add up to 1,563 total members of the class and collective action.  (3/30/18 Order at 4).

the Collective action at the same time that the Court conducts the fairness hearing for the New York Rule 23 Class.

Advanced notice of the hearing would only be sent to the Rule 23 Class Members; the Outside New York Collective Members would not be given notice and an opportunity to be heard about the fairness of the settlement. Unlike the traditional method of advising putative members of an FLSA collective action, who would normally receive notice and a consent to sue or opt-in form, here, the proposal was simply to mail each putative Collective Member a check in the amount previously determined by the parties based on the number of weeks the collective member worked. The language of the cover letter accompanying the check was troubling because it advised the recipient that they were receiving the check after the "Court . . . reviewed and approved the settlement as fair and reasonable and dismissed the case." (3/30/18 Order at 20 (citing Sett. Agr. at 12)). Thus, instead of following the traditional opt-in form procedure generally followed in FLSA collective actions, and being advised of their right to appear at the ultimate fairness hearing, the Collective Members here would be given notice after the fairness of the settlement had already been decided, essentially depriving them of any opportunity to appear at the fairness hearing and to be heard as to their views on the fairness of the amounts they would be receiving and how they were calculated. The Collective Member would simply be deemed to have opted into the settlement by cashing the checks that were sent to them. If the Collective Member cashed the check, he or she would also be releasing defendants from any further claims. Plaintiffs argue that the Collective Members may choose not to cash their checks, and thereby retain their right to bring their own case if they think the amount is unfair.

Following the Court's March 30, 2018 Order, the parties have not revised this aspect of the proposed notice to the Collective Members.

In its March Order, the Court asked counsel to explain how the court has personal jurisdiction over individuals who have not opted into the case at the time of the fairness hearing. The parties here are asking the Court to decide the fairness of the settlement for individuals who are not yet before the Court as parties to the action, and asking the Court to advise members of the collective through the proposed Notice that the Court has already decided the question of fairness and dismissed the case. Cheeks requires that the Court approve a settlement as fair before dismissing the claims. See 796 F.3d at 206. As noted in its earlier Order, it is unclear whether the parties' proposed procedure comports with the Cheeks requirement that the Court approve a proposed settlement as fair before the claims may be dismissed, and how the Court has jurisdiction to decide if a settlement is fair when the affected individuals are not before the court because they have not yet opted in.

The Court is particularly troubled by the fact that many of the workers affected by this settlement may not be particularly sophisticated and may have language issues as indicated in the parties' earlier submissions.[15] Human nature suggests that a person receiving a check in the mail, accompanied by a complicated letter that tells the recipient that the Court had already approved the settlement, would be very likely to simply cash the check, not recognizing the consequences of his actions and not comprehending the notion that if he or she did not cash the

---

[15] Indeed, defendants' counsel alluded to this during the proceedings before this Court, when he stated that one of the reasons why "the defendants chose to go to mediation and settle this case was to avoid the disruption to the business by a notice getting sent out to people around the country who aren't going to understand it or might not understand it . . . ." (Tr. at 8).

22

check, he or she would not be considered part of the class and could bring separate claims if they wished. As previously noted, this is essentially a Hobson's choice effectively depriving the employee of any opportunity to voice concerns about the settlement and giving him no alternative "but to accept the . . . check." (3/30/18 Order at 11).

In response to the Court's concern regarding the mechanics of the hybrid settlement process, plaintiffs' letter contains a list of unpublished cases in this Circuit where this procedure was approved by other courts. In these cases, collective class members, instead of receiving notice and being asked to opt in to the action, were not sent a separate notice, and instead were simply required to endorse and deposit their settlement checks in order to opt in to the settlement. By cashing their checks, they released all claims under the FLSA. The procedure for the Rule 23 Class members in each of these cases required them to opt out in order to exclude themselves from the settlement of their Rule 23 claims. (See Pls.' Ltr at 1-2 (citing Sierra v. Triple J. Associates of Queens, Inc., 12 CV 4462 (E.D.N.Y. 2013); Flores v. KC 53 LLC, 12 CV 8095 (S.D.N.Y. 2013); Viafara v. MCIZ Corp., 12 CV 7452 (S.D.N.Y. 2014); Romero v. LaRevise Assocs. LLC, 12 CV 8324 (S.D.N.Y. 2014); Carillo v. 27-39 East 30 Rest. Corp., 13 CV 4491 (S.D.N.Y. 2015); Guaman v. 5 "M" Corp., 13 CV 3820 (S.D.N.Y. 2015); Alvarado v. Dublin 6 at 115 Broadway, Inc., 14 CV 3939 (S.D.N.Y. 2015); Santana v. Fishlegs LLC, 13 CV 1628 (S.D.N.Y. 2016); Corte v. Fig & Olive Founders LLC, 14 CV 7186 (S.D.N.Y. 2015); Perez v. Dos Toros, LLC, 14 CV 9183 (S.D.N.Y. 2016); Cabrera v. Glen Oak Enterprises, LLC, 14 CV 5599 (E.D.N.Y. 2016); Hernandez v. McGee's Bar & Grill, 15 CV 6067 (S.D.N.Y. 2016); Galvez v. Lucky Peral LLC, 15 CV 5177 (S.D.N.Y. 2016); Solorio v. 142 Mercer Street, LLC, 15 CV 5177 (S.D.N.Y. 2016); Metodio v. Down & Dirty Tacos Meatpacking LLC, 15 CV 8754

23

(S.D.N.Y. 2017); <u>Ruiz v. Force Servs. LLC</u>, 16 CV 6729 (S.D.N.Y. 2017); <u>Vasquez v. GRK 451 Lexington Ave. LLC</u>, 16 CV 7305 (S.D.N.Y. 2017); <u>Iturbide v. Cho Family Dynastia, Inc.</u>, 16 CV 0596 (S.D.N.Y. 2018)).  Plaintiffs' letter also notes that in all of these cases, the class settlements were granted final approval.  (Pls.' Ltr at 2).[16]

As an initial matter, without examining the settlements in each of these cases, the Court is unable to evaluate whether there were additional concerns, which may not be present in this case, that led these courts to adopt this procedure.  Additionally, the Court takes note that the vast majority of these orders in the cases cited by plaintiffs were form orders seemingly prepared by plaintiffs and endorsed by the court; there was no written analysis provided by any of the issuing courts explaining the court's reasoning in approving of such a notice procedure.  Thus, these cases provide little assistance in determining whether the notice procedure is appropriate under

---

[16] Plaintiffs also cite the case of <u>Montenegro v. XpresSpa at Term. 4 JFK, LLC</u>, 15 CV 3539 (S.D.N.Y. 2016), where the same defendants reached a settlement with the plaintiff class, agreeing to a process whereby putative collective members nationwide, who had not previously joined the lawsuit, received checks and by cashing their checks opted into the lawsuit, releasing their claims. (Pls.' Ltr at 2).  The $300,000 settlement fund in that case covered a class of 594 XpresSpa Spa Coordinators, Senior Spa Coordinators, Spa Concierges, Associate Managers and Assistant Managers, seeking overtime premium and damages for violations under Section 195 of NYLL.  As in this case, the Collective Members who worked in New York were to receive 66% of the fund remaining after the deduction for fees and costs, based on the additional claims under New York's Wage Theft Prevention Act.  Counsel requested service awards of $10,000 for each of the three named plaintiffs, expenses of $1,000, a fee for the independent settlement administrator of $9,500, and an award of attorney's fees of one-third or $100,000.  Although the presiding judge approved the settlement by endorsing plaintiffs' counsel's letter, the judge required the parties to reduce the service awards to $6,750.00 and the attorney's fee award to 25% which was closer to the lodestar of $81,137.50.  The Court did not specifically remark on the mechanism for allowing collective members to opt in simply by cashing their checks.  <u>See also</u> <u>Basantes v. Lakeside Adult Day Health Management, LLC</u>, 16 CV 3535 (E.D.N.Y. 2017) (approving FLSA settlement where checks were sent out and claims released by the putative class members).  Again, in <u>Basantes</u>, the Magistrate Judge did not explicitly address the notice procedure or the concerns raised here.

the circumstances of this case.  See Sakiko Fujiwara v. Sushi Yasuda Ltd., 58 F. Supp. 3d 424,

436 (S.D.N.Y. 2014) (noting that "[p]roposed orders are a convenient way of managing

congested dockets, and proposed orders approving unopposed class settlements are particularly

attractive to judges in that they clear large cases from the docket in a situation where the

likelihood of scrutiny from the Court of Appeals is remote . . . [b]ut unlike individual actions, a

class action settlement, if approved, is an adjudication of the matter as to the absent class

members . . . [a]pproval of class action settlements . . . is precisely where judicial scrutiny, not

judicial deference, is most needed.  Orders drafted by counsel . . . should be given little

precedential value").

       The Court's present concerns about this procedure were echoed by the court in Douglas

v. Allied Universal Security Services.  There, Magistrate Judge Bulsara carefully analyzed a

similar hybrid class and collective action settlement, concluding that the court could not

preliminarily approve the settlement in its then current structure.  See 371 F. Supp. 3d at 87.

       First, the court in Douglas questioned the procedure whereby checks would be sent to

class members and potential collective members, similar to the procedure advanced in the instant

case.  Id. at 81.  In that case, after preliminary approval of the settlement, notice was to be sent to

those Rule 23 class members with NYLL claims, who would automatically be included in the

class unless they opted out in 60 days.  Id.  The final approval hearing would then be held and if

approved, checks would be sent to the Rule 23 class members and to the potential collective

members.  Id.  Similar to the procedure proposed in the instant case, those collective members

who cashed their checks would be deemed to have opted into the FLSA settlement and

relinquished their FLSA claims at the same time.  Id.

As the court in <u>Douglas</u> noted, this procedure "ignores the special complexities attendant to approval of a settlement of FLSA claims in this Circuit" resulting from <u>Cheeks</u>. <u>Id.</u> Specifically, the court explained that the requirement of opting into a collective action is to "ensure the presence of plaintiffs before the court," and to enable the court to question the party if necessary. <u>Id.</u> at 86. The court in <u>Douglas</u> noted that the proposed settlement procedure "has the process entirely backwards; it has the Court conduct final <u>Cheeks</u> review before any member of the collective has opted in." <u>Id.</u> In <u>Douglas</u>, the Court's final approval order would release the defendant from all potential claims, but the checks would not even be mailed until 30 days following the final effective date, which was after the final hearing. <u>Id.</u> The court noted that "[t]he proffered structure has the Court opining on the fairness of a settlement – that is not a class action – of employees who are not before the Court and dismissing their claims with prejudice before they ever appear." <u>Id.</u> When asked to provide additional authority for whether the cashing of a check is the appropriate opt-in procedure for a FLSA collective, the court found that the parties had failed to provide sufficient information to conduct a <u>Cheeks</u> review of the proposed settlement. <u>Id.</u> at 87. In the end, despite a motion for reconsideration, the court in <u>Douglas</u> declined to approve the settlement. This Court agrees with the concerns articulated in <u>Douglas</u>, and remains unpersuaded by the cases cited by the parties in support of the proposed procedure.

    2.  <u>Amounts Due to Each Class and Collective Member</u>

        (a)  <u>The Court's Prior Concerns</u>

This Court's March 30, 2018 Order also raised questions about how the amounts to be awarded to each individual Class and Collective Member would be calculated, and the inability

26

of the Court to determine the fairness of the individual allocations when no information had been provided that would allow a comparison between the amount a Class Member would obtain under the Settlement Agreement and the total amount that an individual or even the whole class was projected to receive in the event of full recovery. Instead, the Settlement Agreement simply provided that the Fund would be divided "according to the number of weeks worked within the Relevant Statutory Period."

As noted, under the original Settlement Agreement, which provided for a total settlement fund of $480,000, plaintiffs' attorneys were to receive one-third of the total or $160,000; the firm administering the Fund would receive $50,000; and the named plaintiffs and opt-ins would receive service awards amounting to a total of $56,000. When these amounts and the projected $3,987.50 were subtracted from the total, the amount left in the Fund to be distributed to the 296 Rule 23 New York Class Members and the 1,267 Outside New York Collective Members was less than half the original settlement amount, amounting to $214,000. Under the original Settlement Agreement, members of the New York Rule 23 Class would receive 33.3% of the total Fund to compensate them for their FLSA and NYLL damages, and the Outside New York Collective Members would receive 66.6% of the remainder. As noted in the March 2018 Memorandum and Order, the parties did not explain in their papers how this allocation between the classes was reached, or why they believed such an allocation was fair and reasonable to all Class and Collective Members.

The Revised Settlement Agreement provides for a reduced settlement fund in the amount of $432,000. In response to the Court's request for more information as to the rationale behind the breakdown of the settlement fund, with 33% for the New York Rule 23 Class and 66%

allocated for 1,267 Outside New York Collective members, plaintiffs' letter of May 18, 2018 merely states that the payments are based on "weeks worked within the respective relevant statutory period." (Pls.' Ltr at 2). The letter still does not explain why such a disproportionate percentage of the total fund is allocated to the 296 members of the New York Rule 23 Class. (See discussion infra at 29).

The only other information provided was set out in Exhibits B and C to the May 18, 2018 letter. These exhibits set forth the number of weeks each Class or Collective Member worked during the relevant period, which for the New York Rule 23 Class runs from May 17, 2013 through the date of the Court's Order Preliminarily Approving the Parties' Settlement (Sett. Agr. ¶ 2.3), and for the Outside New York Collective runs from March 16, 2012 through the date of the preliminary approval Order. (Id. ¶¶ 2.17, 2.21).

Exhibit B appears to be the calculations for the amounts to be awarded the New York Rule 23 Class and sets forth in a chart the name of the employee, the XpresSpa where the employee worked, the title of the employee – Massage Therapist, Nail Technician, Nail Tech Est, or Cosmo – whether the employee was still active or had been terminated, the number of weeks worked, the percentage of the settlement fund, and the dollar amount to be received. The amounts received by the New York Rule 23 Class range from a high of $837.37 for people who worked 222 weeks to the lowest award of $3.77 for people who worked only one week. (Pls.' Ltr, Ex. B).

Exhibit C contains the same information but for the members of the Collective Action, with the highest award being $336.63 for people who worked 222 weeks and the lowest award of $1.52 for those who worked only one week. Nowhere in the exhibits or in the plaintiffs'

28

supporting papers do plaintiffs indicate what the average weekly amounts these employees received in commissions were.

A comparison of these Exhibits simply delineates even further the fact that members of the New York Rule 23 Class are receiving significantly more money than the members of the collective action, even though they may have worked the same number of weeks.[17]  According to the Revised Settlement Agreement, one-third of the total settlement fund, or $71,333.33, is to be allocated to the New York Rule 23 Class Members, leaving only $142,666.67 remaining to divide among the remaining 1,267 Outside New York Collective Members.  If anything, the parties' letter and their continued unexplained rationale for allocating to the New York Rule 23 Class a higher percentage of the fund when each individual in the collective action is being paid by the number of weeks, reinforces the Court's concern about the fairness of the proposed settlement.

Although distribution of the fund on the basis of weeks worked seems on its face to be fundamentally fair, the Court's concern also stems from an inability to evaluate the awards under the settlement as compared to what an individual plaintiff might receive if awarded the full value of his claims.  As noted, one of the factors set forth in Wolinsky that the Court is to consider is the plaintiffs' range of possible recovery.  Wolinsky v. Scholastic Inc., 900 F. Supp. 2d at 335.  The Court has not been provided with any information as to the average regular rate of pay that each member of the Collective or the Class earned on a weekly basis.  Although the Named

---

[17] For example, per the parties' Exhibits, a New York Class Member who is an actively employed massage therapist who worked 222 weeks is set to receive $837.37, while an Outside New York Collective Member who is also actively employed as a massage therapist and worked 222 weeks is getting only $336.63.  (See Pls.' Ltr Exs. B, C).  No explanation has been given for the differences such as this one.

Plaintiffs submitted declarations in connection with the initial motion for collective action certification indicating that they worked on average eight hours a day, four to six days a week, there was no information provided as to the amounts they earned.  (See R&R at 3-4).  Since they were paid solely in commissions based on a percentage of the services rendered and products sold, there is no information presently before the Court on which the Court can analyze the possible range of recovery after trial as compared to the amounts to be received in the Revised Settlement Agreement.

Although in this case, the Court has been provided with a spreadsheet showing the names of all of the class and collective members, the numbers of weeks worked, and the projected recovery based on a percentage of the total fund, there has been no information provided as to the number of hours worked by each class member in a given week or the wage rate to be applied.  (See Pls.' Ltr, Exs. B, C).  Based on the spreadsheet provided by plaintiffs' counsel, 159 individuals in the Outside New York Collective or more than 10% of the Outside New York Collective, are to receive less than $10.00, which amounts to less than one hour of overtime pay if the minimum wage were calculated at $7.25 per hour, with over 49 Collective Members receiving $1.52 based on one week worked.

In Mamani v. Licetti, the court noted that the parties in that FLSA and NYLL action had not provided the Court with each party's estimate of the number of hours worked or the applicable wage, leading the court to reject their proposed settlement at that time.  No. 13 CV 7002, 2014 WL 2971050, at * 2 (S.D.N.Y. July 2, 2014).  See also Lopez v. Nights of Cabiria, LLC, 96 F. Supp. 3d 170, 176-77 (S.D.N.Y. 2015) (rejecting a proposed settlement of FLSA and NYLL claims in part because the parties did not provide the court with each party's estimate of

the number of hours plaintiff worked or the applicable wage, in the absence of which "the court

cannot discharge its duty to ensure that the proposed settlement is fair and reasonable").

    In <u>Douglas v. Allied Universal Security Services</u>, the court twice asked the parties to

provide the potential range of recovery for the employees and was simply provided with an

indication that the $2,529,000 gross settlement in that matter reflected a "risk-reduced percentage

of the class members' maximum *probable* underpayment damages of . . . approximately

$3,228,000." 371 F. Supp. at 83 (emphasis in original).  Noting that "a plaintiff must at least

indicate 'each party's estimate of the number of hours worked or the applicable wage,'" <u>id.</u>

(quoting <u>Lopez v. Nights of Cabiria, LLC</u>, 96 F. Supp. 3d at 176); <u>see also</u> <u>Mamani v. Licetti</u>,

2014 WL 2971050, at * 2, the court in <u>Douglas</u> declined to approve the settlement, explaining

that there were a variety of ways in which the parties could provide such information, but that

what they had provided the court with was "inadequate."  <u>Douglas v. Allied Universal Security</u>

<u>Services</u>, 371 F. Supp. at 84.

    As in <u>Douglas,</u> this Court has asked several times for basic information on the potential

range of recovery for any employee.  The parties have provided the Court with even less than the

judge had in <u>Douglas;</u> they have not provided the potential or actual wage rates, the hours

worked, or even an estimate of the overall possible maximum recovery.  Although plaintiffs'

Memorandum of Law submitted in support of the original settlement states that counsel had

estimated that "the total recovery (exclusive of liquidated damages) would be, at most,

approximately $15 Million" (Pls.' Mem. at 15), and counsel mentioned a similar $15 million

figure during the hearing before this Court on April 25, 2018 (Tr. at 15), there are no supporting

declarations or other exhibits that would allow the Court to calculate the plaintiffs' maximum

recovery and then determine if, in light of that, the settlement fund was fair and reasonable as to each plaintiff under Cheeks. (See id. (where plaintiffs' counsel suggested a potential maximum recovery of $15 million, but without any explanation as to how that estimate was achieved)).

Moreover, from plaintiffs' papers, it appears that the parties have reviewed employment records consisting of a sampling of 90 employees nationwide. (Pls.' Mem. at 12). According to the plaintiffs' Memorandum, they analyzed payroll data, including weekly commissions earned and weekly hours worked, in order to calculate the damages owed. (Id.) Thus, it appears that counsel has *some* information that could have been provided to the Court to assist in the fairness analysis.

Without further information about plaintiffs' maximum recovery and without some barometer by which to measure the amounts to be received with the amounts plaintiffs might obtain if the case were to proceed to trial, it is difficult for the Court to opine on the fairness of the settlement, especially to the Outside New York Collective Members.

(b) Risk of Litigation

One factor that courts consider in evaluating both Rule 23 Class Action settlements and Collective Action settlements under the FLSA is the value of the settlement in light of the potential risk that if the case does not settle and proceeds with the litigation, the class and collective members might receive less than what they would receive under the settlement and, indeed, might recover nothing at all. Wolinsky v. Scholastic, Inc., 900 F. Supp. 2d at 335. In this case, the parties raise two issues that they ask the Court to consider in evaluating the fairness of the settlement.

One concern is that at the time of the February 2017 mediation, the defendants were in the process of being acquired by a diversified, publicly traded holding company. (Pls.' Ltr at 3). The plaintiffs contend that given the volatility of the stock market and wholesale management changes in the company as a result of the acquisition, "[t]he future of XpresSpa was uncertain," and "a negotiated settlement agreement is in the interest of all parties." (Id.) While the risks of litigation and the potential of a large payout to a class of employees is a factor that would presumably weigh in the acquiring company's determination as to whether to acquire XpresSpa or not, it is unclear to the Court how this poses a risk factor for the plaintiff Class and Collective that necessarily favors this settlement. Unlike the factor that is often present in FLSA cases, where the employer is a small entity and is facing potential bankruptcy as a result of a potential judgment in a wage and hour case, the parties here have not indicated that this is the concern.

A second risk factor that the parties ask the Court to consider is the possibility that the Collective Members were properly classified as exempt under Section 7(i) of the FLSA and therefore would not be owed any unpaid wages at all. (Pls.' Ltr at 3). Section 207(i) of the FLSA sets forth the "retail or service establishment exemption, that exempts certain employers from having to pay employees overtime for hours worked in excess of 40 per week where: (1) the employer is a retail or service establishment; (2) the employee earns a regular rate of pay in excess of one and one-half times the federal minimum hourly wage rate applicable to him; and (3) earns more than half of his compensation for a representative period (not less than a month) in commissions on goods or services. 29 U.S.C. § 207(i). See Chariot v. Ecolab, Inc., 136 F. Supp. 3d 433, 449 (E.D.N.Y. 2015); see also Schwind v. EW & Assocs., Inc., 371 F. Supp. 2d 560, 563 (S.D.N.Y. 2005). "'Because the FLSA is a remedial statute, its exemptions are

construed narrowly against the employer,'" Chariot v. Ecolab, Inc., 136 F. Supp. 3d at 448, and

the employer bears the burden of proving that an employee is exempt under the FLSA. See

Casanova v. Gold's Texas Holdings Group, Inc., No. 5:13 CV 1161, 2016 WL 1241548, at *4

(W.D. Tex. Mar. 23, 2016).

It is clear that the determination of whether an employee is exempt under this provision

or not is a "mixed question of law and fact," that is largely dependent on the employee's salary

and how an employee spent their working time. Myers v. Hertz Corp., 624 F.3d 537, 548 (2d

Cir. 2010); see also Charlot v. Ecolab, Inc., 136 F. Supp. 3d at 448. In defining "retail or service

establishment," courts have looked to former Section 13(a)(2) of the FLSA which looked to

whether "75% of the annual dollar volume of sales of goods and services is 'not for resale.'" 29

U.S.C. § 213(a)(2) (repealed in 1989). See Casanova v. Gold's Texas Holdings Group, Inc.,

2016 WL 1241548, at *4.

At this point, the Court has no information as to what percentage of defendants' business

is not for resale. Given the description of the types of services rendered – namely, spa services

such as manicures, pedicures and massages – the Court accepts the parties' representations that

XpresSpa falls within the definition of retail or service establishment. Indeed, plaintiffs' letter of

May 18, 2018, indicates that there is authority from Department of Labor that supports the

exempt classification of spa technicians under Section 7(i). (Pls.' Ltr at 3).

Apart from the fact that this authority was never provided to this Court in connection

with the request to approve this settlement, and thus, what it actually states is unclear, the

question of whether the plaintiffs here qualify as exempt may depend on other factors as well,

such as whether they were truly paid on a bona fide commission basis, and, if so, whether the

34

regular rate of pay they received was more than one and one-half the applicable minimum wage rate.  These additional factors are critical in the exemption analysis.

In defining what constitutes a bona fide commission, the court in Casanova explained that it must be "either a percentage or proportion of the ultimate price passed on to the consumer," and it must be "decoupled from actual time worked, so that there is an incentive for the employee to work more efficiently and effectively."  Casanova v. Gold's Texas Holdings Group, Inc., 2016 WL 1241548, at *8 (citing Parker v. NutriSystem, Inc., 620 F.3d 274, 283-84 (3d Cir. 2010)); see also Yi v. Sterling Collision Ctrs, 480 F.3d 505, 509 (7th Cir. 2007) (holding that the hallmark of a commission-based system is the decoupling of payments from actual time worked). Whether a payment is a commission is a question of law that turns not on what the payment is called, but how the payment system works.  See Alvarado v. Corp. Cleaning Servs., Inc., 782 F.3d 365, 367 (7th Cir. 2015) (citing Yi v. Sterling Collision Ctrs, 480 F.3d at 508); see also Almanzar v. C&I Assocs., Inc., 175 F. Supp. 3d 270, 275 (S.D.N.Y. 2016).  Some courts have found that where there are performance related incentives that provide "the opportunity to earn additional income by working faster and completing more tasks," or that allow the technicians "to pick up additional jobs during the day," the employees are exempt as commissioned employees.  See, e.g., Owopetu v. Nationwide CATV Auditing Servs., Inc., 10 CV 18, 2011 WL 88703, at *4 (D. Vt. Mar. 11, 2011); but cf., Almanzar v. C&I Assocs., Inc., 175 F. Supp. 3d at 277 (finding unpersuasive the cases that hold that an employer can demonstrate the Section 7(i) exemption simply by showing that a scheme incentives employees to work faster; the true commission service provides incentives for the employee "'to increase his or her income,'" not

just leave work) (citing <u>Johnson v. Wave Comm. GR LLC</u>, 4 F. Supp. 3d 423, 442 (N.D.N.Y. 2014)).

    Here, the Court has been given very limited information to evaluate whether the compensation system employed by defendants here satisfies the exemption.  The plaintiffs allege that the spa technicians were paid only commissions, receiving 30% of every spa service they performed, and 10% of every product they sold.  (R&R at 2-3).  They further allege that they regularly worked 8 hours per day, 4 to 6 days a week, and that they were not paid minimum wage or any base commission.  (<u>Id.</u> at 3).  Although presumably some of the spa services, such as manicures and pedicures, could be performed more quickly and thus incentivize the technicians to work more quickly, others, such as the 30 minute massage, are clearly tied to the actual time that the massage takes.  There is no way to work faster if the customer is paying for a 30 minute massage.

    More importantly is the Court's continued concern that it has no information to evaluate the third element of the commission test – namely, that the employees' regular rate of pay exceeds one and one-half time the minimum rate.  In <u>Charlot v. Ecolab, Inc.</u>, the court addressed the regular rate of pay question, citing 29 C.F.R. § 779.419; "the regular rate of pay 'is a rate per hour, computed for the particular workweek by a mathematical computation in which hours worked are divided into straight-time earnings for such hours to obtain the statutory regular rate.'"  136 F. Supp. 3d at 449.  As noted above, the Court requested information as to the amount of damages the employees would receive if they were to succeed on all of their claims at trial.  Instead of providing any concrete information in this regard, plaintiffs' counsel postulated that under the best possible case scenario, plaintiffs would receive $15,000,000 after trial.  It is

36

not possible with this limited information for this Court to determine the average regular rate of the XpresSpa technicians.  As the court in <u>Casanova v. Gold's Texas Holdings Group, Inc.</u>, noted, "the purposes of the FLSA are to remove labor conditions that are detrimental to the health and safety of workers, to spread employment opportunity among many workers to reduce unemployment, and to increase the welfare of low paid workers." 2016 WL 1241548, at *9. When, as in <u>Yi v. Sterling Collision Ctrs</u>, 480 F.3d at 510, the workers are earning more than $60,000 a year, they may not need the protections of the FLSA. <u>See</u> <u>Mechmet v. Four Seasons Hotels, Ltd.</u>, 825 F.2d 1173, 1177-78 (7th Cir. 1987) (stating that well compensated employees who are paid on commission are "not the marginal, non-unionized workers for whom the overtime provisions were designed"); <u>English v. Ecolab, Inc.</u>, No. 06 CV 5672, 2008 WL 878456, at *4 (S.D.N.Y. Mar. 31, 2008).  Here, without any information as to what the spa technicians earned on a regular basis, it is impossible for this Court to determine whether the exemption would or would not apply.

The only issue addressed by plaintiffs' counsel in his letter is the question of whether the exemption would not apply because the spa technicians were subject to a rotation policy which required them to spend 30% of their time soliciting customers for services to be rendered by the other technicians; it is conceded that they did not receive any compensation for time spent during this solicitation period. (Pls.' Ltr at 3).  While plaintiffs raise the concern that there were no cases addressing a similar uncompensated time period, the Court finds that the ultimate question as to the exempt status of these employees may instead depend on the regular rate of pay.  In the absence of that information, the Court cannot evaluate the risk to plaintiffs were the case to move forward with litigation and trial.

This is crucial information because whether or not the exemption applies would greatly influence plaintiffs' chance of success were this case to proceed to litigation and trial; it is thus relevant information for this Court to consider when it analyzes whether this settlement is truly fair and reasonable. See Wolinsky v. Scholastic, Inc., 900 F. Supp. 2d at 335 (listing the factors courts consider when determining whether a proposed settlement is fair and reasonable).

Finally, the Court notes that the potential applicability of this exemption was presumably known at the time the Complaint was filed, particularly given that this is not the first time that XpresSpa has been sued for wage and hour violations. In 2010, the defendants were sued in this district for wage and hour violations for all spa technicians employed by XpresSpa at LaGuardia and JFK Airports, as well as other locations within New York for the limited period from September 12, 2010 through September 30, 2012. Kuznetsov v. Xpresspa-Jdee JV, LLC, No. 10 CV 3473 (E.D.N.Y. July 29, 2012). In that case, the parties reached a settlement as to 248 class and collective action plaintiffs in the amount of $137,000 which was approved by the court on November 5, 2013. (Kuznetsov Sett. Agr.[18] at 4). There, the court was presented with information regarding the employees' rate of pay and hours worked which has not been provided here. Additionally, in that settlement, traditional notice was mailed to the putative class and collective members, and members were required to submit a claim form or opt-in notice to participate in the settlement. (Id. at 10).[19]

---

[18] Citations to "Kuznetsov Sett. Agr." refer to the settlement agreement filed on May 15, 2013 as Docket Number 104 in Kuznetsov v. Xpresspa-Jdee JV, LLC, No. 10 CV 3473 (E.D.N.Y.).

[19] That settlement in Kuznetsov provided for $360.00 to be paid to employees who had been employed by XpresSpa for more than one year, $310.00 to be paid to employees who had worked between six months and one year, and $195.00 to employees who had been employed for less than six months. (Id. at 6-7). Although this Court has no information about the factors and

There are additionally other components of the Cheeks review that the Court cannot complete because of a lack of necessary information.

### 3. The Service Awards

The next concern raised by the Court in its March 30, 2018 Order related to the proposed service orders. An "incentive" or "service" award is common in class actions and serves to compensate plaintiffs for their time and effort in the pursuit of litigating the claim. See In re Nissan Radiator/Transmission Cooler Litig., 2013 WL 4080946, at *15; Capsolas v. Pasta Res. Inc., 2012 WL 4760910, at *9. The general "guiding standard" is, broadly, "the existence of special circumstances including the personal risk (if any) incurred by the plaintiff[] in becoming and continuing as a litigant . . . [or] any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim, and, of course, the ultimate recovery." Gay v. Tri-Wire Eng'g Solutions, Inc., No. 12 CV 2231, 2014 WL 28640, at *13 (E.D.N.Y. Jan. 2, 2014) (quoting Roberts v. Texaco, Inc., 979 F. Supp. 185, 200 (S.D.N.Y. 1997)).

Courts often grant named plaintiffs in class action cases an enhanced award, either in the form of a flat fee or a multiplied amount of their share of the settlement fund. Compare Capsolas v. Pasta Res. Inc., 2012 WL 4760910, at *10 (awarding a service award of $20,000 to one named plaintiff and $10,000 for the remaining named plaintiffs), with Velez v. Majik Cleaning Serv., Inc., No. 03 CV 8698, 2007 WL 7232783, at *7 (S.D.N.Y. June 22, 2007) (awarding named

---

considerations that led to that settlement and expresses no opinion as to the fairness of its terms, the court in Kuznetsov was given some information necessary to evaluate the fairness of the settlement, and that agreement did provide the standard notice to the collective members. Moreover, it appears based on a comparison with that settlement, that many of the Class and Collective Members here are receiving only a fraction of what was paid in the earlier suit.

39

plaintiffs "twice the amount of the award that other class members will receive"). The Court notes that the risks to named plaintiffs in FLSA collective actions are similar to those in the Rule 23 class action context: named plaintiffs, in challenging practices of their current employers, risk retaliation and loss of employment, and may also risk discrimination from future employers who learn of the litigation. See Diaz v. Scores Holding Co., Inc., No. 07 CV 8718, 2011 WL 6399468, at *3 (S.D.N.Y. 2011) (stating that "[i]n FLSA collective actions, just as in Rule 23 class actions, service awards are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff"); Velez v. Majik Cleaning Serv., 2007 WL 7232783, at *7 (stating that "in employment litigation, the plaintiff is often a former or current employee of the defendant, and thus, by lending his name to the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers").

Under the original Settlement Agreement, the four named plaintiffs were to receive services awards of $10,000 each, for a total of $40,000; the remaining eight opt-ins were to receive $2,000 apiece in service awards. Pursuant to the original Settlement Agreement, the total amount of $56,000 was to be subtracted prior to distribution of the funds to the Class and subtracted from the total Settlement Fund rather than from the amounts allocated to the two subgroups of Outside New York Collective Members and the New York Rule 23 Class. Given the disparate amounts to be received in service awards and the average recovery to be awarded

40

the other class members (see discussion infra), the Court expressed concern as to the fairness of these awards and directed the parties to provide further justification.[20]

In their letter dated May 18, 2018, plaintiffs indicate that they have revised the mechanism whereby the four Named Plaintiffs are to be compensated. (Pls.' Ltr at 3). The parties have agreed to reduce the settlement fund by $48,000. (Id.) At the same time, they have entered into a separate agreement to compensate the four Named Plaintiffs for their claims of national origin discrimination. (Id.) Now, instead of receiving $10,000 each as a service award under the Class and Collective settlement, each of the four Named Plaintiffs and the eight opt-ins will receive $2,000. (Id.) They will continue to receive the $10,000 previously designated as "service awards." Only now, the amounts have been designated as compensation for discrimination claims. Since the Fund has been reduced by $48,000, the attorneys' fees under the Settlement have also been decreased from $160,000 to $144,000. (Pls.' Ltr at 3).

While the Court is not required to consider the fairness of a separate settlement between the parties to resolve claims that are not brought under the FLSA or as part of the class action, the parties' revised agreement in this case does not materially change the amount of the fund available to the Class and the Collective. Out of the revised total settlement amount of $432,000, minus the $144,000 for attorneys, the $24,000 in service awards, the $50,000 in Claims Administrator's fees, and the $3,987 in litigation costs, there still remains a net settlement fund of only $214,000 to be divided among 1,562 total class and collective members.

---

[20] The Court notes that the judge in Montenegro v. XpresSpa at Term. 4 JFK, LLC, 15 CV 3539, may have had similar concerns in the size of the service awards to the named plaintiffs as compared to the amounts distributed to class members, ultimately ordering their reduction.

41

4. The *Cy Pres* Award

Under the original Settlement Agreement, any uncashed settlement checks were to be donated to the Manhattan Children's Center as *cy pres* beneficiary. The Court, in its March 30, 2018 Memorandum and Order, questioned whether this organization "'reasonably approximate[d]'" the interests of the employees in this case. (3/30/18 Order at 8 (quoting In re Citigroup Secs. Litig., 199 F. Supp. 3d 845, 852 (S.D.N.Y. 2016))). See also Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 436 (2d Cir. 2007).

In their May 18, 2018 letter, counsel for plaintiffs indicate that the parties have revised the settlement procedure so that there will be second distribution made on a *pro rata* basis to the Rule 23 Class and Collective Members who endorse and deposit their Settlement checks in the initial distribution. (Pls.' Ltr at 3; Sett. Agr. ¶ 4.1(D)). Any unclaimed funds remaining 120 days after the second distribution of checks, if any, shall be applied as a *cy pres* donation to the Chinese Staff and Workers Association. (Id. at 4). According to plaintiffs' letter, this organization directly benefits immigrant workers' rights. (Id.)

Courts have noted that the "proper tactic to ensure class members obtain the fullest possible recovery is the requirement that *cy pres* designations occur only when it is no longer feasible to distribute funds to the class." In re Citigroup Secs. Litig., 199 F. Supp. 3d at 852. To determine the appropriateness of the *cy pres* designees, courts consider whether the designee reasonably approximates the interests of the class and the purposes of the litigation. Id. In this instance, plaintiffs state that their designee, the Chinese Staff and Workers Association ("CSWA"), is "an organization that will directly benefit and impact immigrant workers' rights." (Pls.' Mem. at 4). The parties have not provided the Court with any additional information about

42

CSWA beyond the organization's website. (Id.) Although the Court has independently reviewed CSWA's website, which indicates that CSWA is a workers' rights organization which advocates on behalf of and provides resources to low-wage workers and seems to be an appropriate recipient, the Court finds that it would be premature to approve the *cy pres* designee until after there has been a second distribution to the Class and Collective Members on a *pro rata* basis. See In re Citigroup Secs. Litig., 199 F. Supp. 3d at 852.

  5.  Attorneys' Fees

In the Revised Settlement Agreement, counsel for plaintiffs indicates that they are seeking an award of attorneys' fees of $144,000, representing 33.33% the reduced settlement fund. After deductions for costs, administrator's fees and service awards from the settlement fund, the attorneys' fees represent over 40% of the remaining funds. While the final fee award is not being determined at this point, "[c]ounsel must provide a factual basis for a fee award, typically with contemporaneous time records." Guareno v. Vincent Perito, Inc., No. 14 CV 1635, 2014 WL 4953746, at *2 (S.D.N.Y. Sept. 26, 2014). Courts may award fees based on either a lodestar calculation or a percentage of the settlement fund; however, Cheeks and Wolinsky required the court to review the attorneys' fee as part of the court's overall review of the fairness of the settlement. As the court in Douglas v. Allied Universal Security Services noted, "[a] fee that is so disproportionate to a plaintiff's recovery raises questions of whether counsel has taken monies that should be awarded to the employee." 371 F. Supp. 3d at 85. Thus, "[e]ven where attorneys' fees are sought pursuant to the percentage of the fund method, 'counsel must submit evidence providing a factual basis for the award.'" Arango v. Scotts Co., LLC, No. 17 CV 7174,

43

2019 WL 117466, at *5 (S.D.N.Y. Jan. 7, 2019).  A lodestar check is a common way for courts

in this circuit to review the reasonableness of an attorney's requested fee.  See Bhardwhaj v.

Alan's Farmland Ltd., No. 16 CV 7880, 2018 WL 1891313, at *2 (S.D.N.Y. Apr. 5, 2018).

In this case, plaintiffs' counsel has not provided any records of hours spent on this matter,

nor have they provided any information as to the rates at which they bill their clients.  Given the

incredibly small amounts that many individual Class Members are set to receive under the

Revised Settlement Agreement, with none of the awards exceeding $837 and many amounting to

less than $10 a person, the fee award here of $144,000, considered in conjunction with the

$50,000 administrator's award,[21] seems disproportionate to the amounts being awarded to the

Class.

## CONCLUSION

Accordingly, for the reasons stated above, the Court denies the parties' motion for

preliminary approval of the proposed settlement as articulated in the revised Settlement

Agreement.  The parties may submit a further revised settlement agreement, along with the

supporting information detailed above, by September 19, 2019.

---

[21] As noted, the chosen administrator in this case is owned in part by plaintiffs' counsel.
It is unclear to this Court why the administrator's fee in this action is $50,000, given that
plaintiffs have directed the Court's attention to an earlier nationwide collective action against the
same defendants, which involved similar claims.  (See Pls.' Mem. at 2).  There, the fee to
administer the nationwide class and collective settlement was only $9,500, which counsel, the
same counsel representing the parties in this case, noted was "consistent with prevailing market
rates."  Montenegro v. XpresSpa at Term. 4 JFK, LLC, 15 CV 3539, Document Number 31 at 3.

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
August 20, 2019

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York